No. 12-6115

# In the United States Court of Appeals for the Sixth Circuit

————————

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

KEAIRUS WILSON,
Defendant-Appellant.

————————

On Appeal from the United States District Court
for the Middle District of Tennessee
No. 3:10-cr-163

————————

**BRIEF FOR THE UNITED STATES**

————————

DAVID RIVERA
Acting United States Attorney

SCARLETT M. SINGLETON
Assistant United States Attorney
Middle District of Tennessee

MYTHILI RAMAN
Acting Assistant Attorney General

DENIS J. MCINERNEY
Acting Deputy Assistant Attorney General

DAVID M. LIEBERMAN
Attorney
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 305-4620
david.lieberman@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT REGARDING ORAL ARGUMENT ............................ vii

STATEMENT OF JURISDICTION ....................................................... 1

ISSUES PRESENTED ............................................................................ 2

STATEMENT OF THE CASE ................................................................ 2

STATEMENT OF FACTS ...................................................................... 4

      I.     The Bloods organized a violent gang in Nashville ............................... 4

      II.    Wilson joined East Side Skyline Piru ..................................... 7

            a.   Wilson fatally shot Michael Goins ................................ 8

            b.   Wilson participated in a drive by shooting of
               Alexandra Franklin ....................................................... 9

      III.   A jury convicted Wilson of multiple racketeering, murder,
           and firearm-related offenses ............................................... 11

SUMMARY OF ARGUMENT ............................................................. 14

ARGUMENT ........................................................................................ 18

      I.     The government presented sufficient evidence to
           convict Wilson of murder in aid of a racketeering
           enterprise (Counts 2 and 6) ............................................... 18

            a.   Standard of Review ..................................................... 19

b.  The jury could reasonably conclude that Wilson
murdered his victims to promote his position
within the Bloods ........................................................................20

   i.   The Bloods were conditioned to kill rival
gang members ................................................................20

   ii.  The record supports the jury's conclusion that
Wilson shot Goins with the general purpose
of promoting his position in the gang (Count 2) ...........22

   iii. The record also supports the jury's conclusion
that Wilson shot Franklin with the general purpose
of promoting his position in the gang (Count 6).............24

II.   The district court did not commit plain error when
instructing the jury on the elements of conspiracy
to use and carry firearms during and in relation to
crimes of violence (Count 27) .......................................................27

   a.  Standard of Review...................................................................29

   b.  The alleged error was not plain .................................................30

   c.  The alleged error was necessarily harmless ..............................31

III.  The district court did not err when instructing the jury on
the elements of conspiracy to participate in
racketeering activity (Count 1) .......................................................33

   a.   Standard of Review .................................................................34

   b.  The court correctly refused the proposed instruction
because a RICO conspiracy charge does not
require juror unanimity as to the underlying
predicate acts..........................................................................35

   c.  Any instructional error was harmless .......................................37

IV.    The Court should vacate Wilson's § 924(c) sentences to
       cure the double jeopardy violation (Counts 3 and 7)......................38

CONCLUSION.......................................................................................41

CERTIFICATE OF COMPLIANCE.......................................................42

DESIGNATION OF DISTRICT COURT RECORD .............................43

CERTIFICATE OF SERVICE ..............................................................45

# TABLE OF AUTHORITIES

## CASES

*Ball v. United States*, 470 U.S. 856 (1985)................................................................45

*Jackson v. Virginia*, 443 U.S. 307 (1979)................................................................20

*Murr v. United States*, 200 F.3d 895 (6th Cir. 2000)................................................34

*Neder v. United States*, 527 U.S. 1 (1999)................................................................35

*Richardson v. United States*, 526 U.S. 813 (1999)....................................................33

*Salinas v. United States*, 522 U.S. 52 (1997)................................................ 36, 39, 40

*United States v. Anderson*, 605 F.3d 404 (6th Cir. 2010)........................................38

*United States v. Applins*, 637 F.2d 59 (2d Cir. 2011)...................................... 40, 41

*United States v. Banks*, 514 F.3d 959 (9th Cir. 2008) ...................................... *passim*

*United States v. Carson*, 455 F.3d 336 (D.C. Cir. 2006)........................................24

*United States v. Catalan-Roman*, 585 F.3d 453 (1st Cir. 2009)..............................45

*United States v. DeCarlo*, 434 F.3d 447 (6th Cir. 2006)................................. 44, 46

*United States v. DeJohn*, 368 F.3d 533 (6th Cir. 2004)..........................................32

*United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001)............................................24

*United States v. Driver*, 535 F.3d 424 (6th Cir. 2008) ..........................................39

*United States v. Farmer*, 583 F.3d 131 (2d Cir. 2009)..........................................27

*United States v. Flynn*, 87 F.3d 996 (8th Cir. 1996)..............................................41

*United States v. Fowler*, 535 F.3d 408 (6th Cir. 2008) ..........................................39

*United States v. Glecier*, 923 F.2d 496 (7th Cir. 1991) .................................... 40, 42

*United States v. Hein*, 395 Fed. Appx. 652 (11th Cir. 2010).......................... 40, 41

*United States v. Jackson*, 473 F.3d 660 (6th Cir. 2007) ..........................................20

*United States v. Kelsor*, 665 F.3d 684 (6th Cir. 2011) ...........................................42

*United States v. Martin*, 520 F.3d 656 (6th Cir. 2008)...........................................32

*United States v. Morrison*, 594 F.3d 543 (6th Cir. 2010).......................................32

*United States v. Randall*, 661 F.3d 1291 (10th Cir. 2011) ........................ 40, 41, 42

*United States v. Ross*, 502 F.3d 521 (6th Cir. 2007) ...............................................21

*United States v. Solorio*, 337 F.3d 580 (6th Cir. 2003) ..........................................20

*United States v. Stone*, 954 F.2d 1187 (6th Cir. 1992) .................................... 30, 31

*United States v. Talley*, 164 F.3d 989 (6th Cir. 1999)............................................20

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)..............................................28

*United States v. Woodruff*, 726 F.3d 845 (6th Cir. 2013).......................................34

## STATUTES AND RULES

18 U.S.C. § 1959...................................................................................... 2, 3, 18

18 U.S.C. § 1961 ............................................................................................33

18 U.S.C. § 1962 .................................................................... 2, 16, 33, 35

18 U.S.C. § 3231 ..............................................................................................1

18 U.S.C. § 924 ...................................................................................... *passim*

18 U.S.C. § 1959...........................................................................................18

18 U.S.C. § 1961 ....................................................................................18

28 U.S.C. § 1291 .....................................................................................1

## STATEMENT REGARDING ORAL ARGUMENT

Although the facts and legal arguments are adequately presented in the briefs and record, the trial proceedings were lengthy and the district court imposed a life sentence on Wilson. As a result, the United States does not oppose Wilson's request for oral argument.

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————

No. 12-6115

———————

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

KEAIRUS WILSON,
Defendant-Appellant.

———————

On Appeal from the United States District Court
for the Middle District of Tennessee
No. 3:10-cr-163

———————

**BRIEF FOR THE UNITED STATES**

———————

**STATEMENT OF JURISDICTION**

Defendant-Appellant Keairus Wilson appeals from the final judgment in this criminal case. The district court (Trauger, J.), which had jurisdiction under 18 U.S.C. § 3231, entered judgment on September 10, 2012. R. 1880 (#8943).[1] Wilson filed a timely notice of appeal on September 17, 2012. R. 1888 (#8990). This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] The government's record citations refer to the district court docket entry (R. __) or the trial transcript (Tr. __). The government's citations also reference the PageID number (#__) generated by PACER.

**ISSUES PRESENTED**

1.    Whether the evidence was sufficient to prove that the defendant murdered his victims for the purpose of maintaining or increasing his position in a racketeering enterprise.

2.    Whether the district court plainly erred in failing to instruct the jury that, to convict the defendant of conspiracy to use and carry firearms during and in relation to crimes of violence, it had to agree unanimously on the specific "crimes of violence" contemplated in the conspiracy.

3.    Whether the district court erred in failing to instruct the jury that, to convict the defendant of conspiracy to participate in a racketeering activity, it had to agree unanimously on the specific predicate acts supporting the conspiracy.

4.    Whether the defendant received multiple punishments for the same offense, in violation of the Double Jeopardy Clause, based on his use and carrying of a firearm during and in relation to a crime of violence that resulted in a murder.

**STATEMENT OF THE CASE**

A grand jury in the Middle District of Tennessee charged Wilson and others with numerous offenses arising out of their gang activities: (1) conspiracy to participate in racketeering activity, in violation of 18 U.S.C. § 1962(d) (Count One); (2) murdering Michael Goins in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Two); (3) using and carrying a firearm during and in relation

to the murder of Michael Goins, in violation of 18 U.S.C. § 924(c) (Count Three); (4) murdering Michael Goins through the use of a firearm, in violation of 18 U.S.C. § 924(j) (Count Four); (5) using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Five); (6) murdering Alexandra Franklin in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count Six); (7) using and carrying a firearm during and in relation to the murder of Alexandra Franklin, in violation of 18 U.S.C. § 924(c) (Count Seven); (8) murdering Alexandra Franklin through the use of a firearm, in violation of 18 U.S.C. § 924(j) (Count Eight); and (9) conspiracy to use and carry firearms during and in relation to crimes of violence, in violation of 18 U.S.C. § 924(o) (Count 27). *See* Second Superseding Indictment, R. 1147 (#3359-3421).

Following a three-week trial, a jury acquitted Wilson on Count Five, but convicted him on the other counts.[2] *See* Judgment, R. 1880 (#8943). The district court sentenced Wilson to life imprisonment on Counts One, Two, Four, Six and Eight and 20 years on Count 27, all to run concurrently; to be followed by consecutive sentences of 10 years on Count Three and 25 years on Count Seven. *Id*. at 3 (#8945). Wilson filed a timely notice of appeal.

---

[2] The same jury also convicted another gang member, Rondarius Williamson, of similar offenses. Williamson has filed a separate appeal of his conviction. *See United States v. Williamson*, No. 12-6150.

## STATEMENT OF FACTS

Defendant Keairus Wilson was member of East Side Skyline Piru, a set of the Bloods street gang.  The Bloods regularly engaged in assaults, robberies, and shootings around Nashville, particularly with rival gang organizations.   In 2008, alongside other Bloods members, Wilson fatally shot two victims associated with rival gangs:  Michael Goins, a member of the Gangster Disciples; and Alexandra Franklin, the girlfriend of a Crips gang member.  In both instances, Wilson snuck up behind or next to his victim and, without warning, fired his gun.

### I.    The Bloods organized a violent gang in Nashville.

The Bloods street gang formed in the late 1960s, originating in California and spreading across the country.  Tr. 252 (#9296).   Often, the gang divides into sets, affiliating with certain neighborhoods or areas within a city.  Nashville hosts two sets—East Side Skyline Piru and Tree Top Piru.  East Side Skyline Piru operates north of downtown in the Salemtown neighborhood.  Tr. 190 (#9234).

Like other street gangs, the Bloods employ a hierarchical structure. Members rise from tiny gangster, to baby gangster, to young gangster, to young original gangster, to original gangster.   Tr. 650 (#9687); Tr. 882-883 (#9912-9913).  Each member has a "big homie," who oversees his activities and issues orders.  Tr. 196 (# 9240).  The member can achieve a higher rank by "putting in work," which involves robbing, shooting, or trafficking drugs on behalf of the

gang.  Tr. 200-201 (#9244-9245); Tr. 649 (#9686); Tr. 882-883 (#9912-9913), Tr. 1826 (#10856).  Each member also receives a list of rules, which, for instance, require members to "[r]espect all ranks and kalls" (implement the original gangster's directives), to "[b]eware of 107 underground crabs" (look out for informants), to "[k]now your enemies," and to "show respect and love to red homies" (honor deceased members).  Tr. 218-222 (#9262-9266).

The Bloods take an oath:  "When I die, bury me six feet deep, place a red flag at my feet.  Creep them niggas and put me to sleep.  I did it for y'all.  Y'all do it for me."  Tr. 225 (#9269).  They also recite a "Bangin Creed," reminding members that "[b]angin ain't a part-time job.  It's a full time career.  Bangin is killing and not caring, getting caught and not telling.  Bangin is love for your set and hate for your enemy."  *Id*.; *see also* Tr. 1828 (#10858) (reciting Skyline prayer to "[p]ut a crab in the dust," meaning to "kill a rival gang member").

The "original gangster" coordinates the enterprise.  He calls meetings, where members report activities and shootings, settle disputes, and pay dues.   Tr. 328-333 (#9372-9377).  Members will also assault, or "violate," another member for acts of disobedience—a ritual that may result in the insubordinate member's hospitalization.  Tr. 331 (#9375), *see also* Tr. 438-442 (#9482-9486) (violation of Joedon Bradley).  They will also initiate new Bloods into the gang during a meeting.  In order to be "put down," a circle of veterans violently attacks the new

5

member, beating him for 51 seconds, pausing, and then beating him for 50 seconds.  Tr. 199 (#9243).

Activities vary by member.  Some sell drugs, while others rob and shoot. *See, e.g.*, Tr. 201 (#9245) (selling cocaine, marijuana, Dilaudid, ecstasy); Tr. 262 (#9306) (robbing); Tr. 650-651 (#9687-9688) (selling crack cocaine); Tr. 884 (#9914) (selling drugs and shooting); Tr. 1827 (#10857) (same).  The Bloods battle the Crips because, "when you get in the Bloods gang, you automatically get a beef with the Crips."  Tr. 644 (#9681).  They also fight the Gangster Disciples and the Vice Lords.  Tr. 200-201 (#9244-9245); Tr. 1827 (#10857).  Any sign of disrespect—uttering a derogatory remark like "crab" or flashing a "CK" (Crip-Killer) gesture to an adversary—could prompt a fight.  Tr. 203-204 (#9247-9248); Tr. 644-646 (#9681-9683).  Gang members regularly carry guns, Tr. 266 (#9310), Tr. 355 (#9399), Tr. 698 (#9728), and regularly engage in shootouts, Tr. 448 (#9492), Tr. 656 (#9693), Tr. 695 (#9725), Tr. 1836-1838 (#10866-10868).

There is very little separation between the Bloods sets.  East Side Skyline Piru and Tree Top Piru hold joint meetings, Tr. 326 (#9370), Tr. 1166-1167 (#10196-10197), in order to "collaborat[e] to see what [the sets] were talking about."  Tr. 327 (#9371).  They reach collective decisions on gang punishment, Tr. 433-434 (#9477-9478), and solicit donations for jailed members, Tr. 467

(#9511).  All in all, East Side Skyline and Tree Top operate as "one big unit."  Tr. 327 (#9371).

## II.    Wilson joined East Side Skyline Piru.

Wilson was "beat in" to East Side Skyline Piru in 2006, surviving the traditional 51-second/50-second assault on new members.  Tr. 638-641 (#9675-9678).  Wilson reported to Donald Dowell ("D-Dow"), and he oversaw an individual named "Binko."  Tr. 197 (#9241); Tr. 640 (#9677).

Wilson got several gang tattoos and regularly flashed gang signs and gestures.  Tr. 206, 209-214 (#9250, 9253-9258).  Wilson was present during a 2007 intra-gang feud, where one member shot another in the leg.  Tr. 695-696 (#9725-9726).  He also attended a 2008 party at a Days Inn.  When police responded to complaints about the party, they found Wilson and other members in a hotel room with three loaded pistols.  Tr. 149-150 (#9193-9194).  Wilson identified a .38 revolver as his.  Tr. 151 (#9195).

In May 2008, Bloods member Brandon Muhammad ("B-100") was shot outside a Nashville club.  Tr. 658-659 (#9695-9696); Tr. 2091 (#11121).  News quickly circulated among the Bloods that their rivals—the Crips—had shot Muhammad.  Tr. 270-271 (#1897-1898); Tr. 2092 (#11122).  At that point, the Bloods vowed revenge:  "Everybody was ready to put in work . . . find them, shoot them and possibly kill them."  Tr. 271 (#1898).  Members also got "B-100" tattoos

7

and t-shirts to memorialize Muhammad.  Tr. 272-276 (#9316-9320); Tr. 2093-2094 (#11123-11124).

### a. Wilson fatally shot Michael Goins.

On June 14, 2008, the Bloods—East Side Skyline Piru and Tree Top Piru— were socializing at a block party.  Tr. 898-899 (#9928-9929); Tr. 1842-1843 (10872-10873); Tr. 2096 (#11126).  Michael Goins, a Gangster Disciples member, pulled up in a gray car.  Tr. 905 (#9935); Tr. 1843 (#10873).  The Bloods had previously clashed ("beef[ed]") with Goins at a club.  Tr. 905 (#9935).  And just a few days earlier, Wilson and two other Bloods—Jermaine Tate and Lonnie Newsome—spotted Goins while driving.  Wilson "had his gun, and . . . was about to get out of the car and get [Goins]," but Newsome (a Tree Top original gangster), objected, saying "don't do it outside my car."  Tr. 1844-1845 (#10874-10875).

This day was different.  Goins and a female companion left the car and walked up a set of stairs towards an apartment complex.  Wilson "walk[ed] behind [Goins], cut in between him and the girl, and shot him like three times."  Tr. 1848 (#10878); *accord* Tr. 2100 (#11130) ("When [Goins] walked up the stairs Wilson pulled the gun out and shot him in his back area.").  Goins fell to the ground.  Tr. 1850 (#10880); Tr. 2101 (#11131).  When someone yelled that Goins was reaching for a gun, Wilson dropped his gun and fled the scene.  *Id.*  An individual named "Reggie Ba" retrieved Wilson's gun and fired additional rounds at Goins.

8

Tr. 1852 (#10882); Tr. 2101 (#11131).  The medical examiner later concluded that Goins died from multiple gun-shot wounds.  Tr. 2211 (#11241).

Shortly after the shooting, Cedric Woods (an East Side Skyline Piru member) sent a letter to Donald Dowell (Wilson's "big homie") complaining that Dowell had promoted Wilson, but not him, to the rank of "baby gangster."  Tr. 725-726 (#9755-9756).

### b.      Wilson participated in a drive-by shooting of Alexandra Franklin.

On July 19, 2008, Wilson and several other Bloods—Ricky Williams, Antonio Washington ("T.O."), and Montez Hall ("Fat Tez")—met at Cedric Woods's house.[3]  Tr. 360 (#9404); Tr. 732 (#9762).  After "chilling" and "messing around," the group "wanted to swang it," which means "put in some work." Tr. 363 (#9407).  They initially decided to target the Five Deuce Hoover Gangster Crips—the gang that allegedly murdered Brandon Muhammad.  Tr. 363 (#9407); Tr. 734 (#9764).

The group climbed into a small four-door car that Wilson had borrowed from his cousin.[4]  Tr. 365 (#9409); Tr. 733 (#9763).  Williams drove, Hall sat in the front passenger seat, and Washington, Woods, and Wilson rode in the back.

---

[3]      Woods testified that he was with Wilson, Williams, and Hall, but did not remember Antonio Washington being present.  Tr. 735 (#9765).

[4]      Williams thought the car was green, Tr. 365 (#9409), but Woods stated it was maroon, Tr. 733 (#9763).

9

Tr. 363 (#9407); Tr. 735 (#9765).   Williams, Hall, Woods, and Wilson all carried guns.  Tr. 364 (#9408); Tr. 740 (#9770).  They soon spotted a Crip, Archie Henry, at a gas station.  According to Williams, "[o]ur intention was to shoot him . . . but too many people were at the gas station."  Tr. 366 (#9410).  Williams trailed Henry as he left the gas station, but a police car appeared, and Williams discontinued the pursuit.  Tr. 366 (#9410).

The group next drove to a neighborhood inhabited by the 98 Mafia Main Street Crips and pulled into an apartment complex.  Tr. 368 (#9412); Tr. 735 (#9765).   A red Dodge Stratus passed them, and Wilson identified the driver as Alexandra Franklin, the girlfriend of Clarence Shaw ("Killa Pooh").   Tr. 369 (#9413); Tr. 738 (#9768).  Shaw was a Crip.  Tr. 359 (#9403); Tr. 737 (#9767).

Wilson said "let's get her," but Williams and Woods hesitated.  Tr. 369 (#9413); Tr. 736 (#9766) (Woods) (Wilson said "we're fixing to get her.").  Wilson reminded the group that Shaw had previously threatened to kill Woods's girlfriend.  Tr. 370 (#9414); Tr. 736, 743 (#9766, 9773).  Williams then followed Franklin's car as she left the apartment complex.  Tr. 371 (#9415).  He pulled alongside the Dodge Stratus at a stop sign and rolled down the windows, and "[t]hey all fired out of the right side."  Tr. 373 (#9417); Tr. 736, 745-746 (#9766, 9775-9776).  Franklin got out and started to run, and her car rolled uncontrollably

10

into a yard, knocking down a fence. Tr. 837-838 (#9867-9868). Franklin soon collapsed to the ground, unable to talk. Tr. 841 (#9871).

An SUV drove towards the Bloods. Thinking that Shaw and other Crips were giving chase, Williams sped away, running stops signs and doing a U-turn. Tr. 376 (#9420); Tr. 747 (#9777). Hall also fired his gun at the SUV. Tr. 377 (#9421); Tr. 749-750 (#9779-9780). The group then returned to Woods's house. Tr. 377 (#9421); Tr. 750 (#9780). Alexandra Franklin died several days later from multiple gun-shot wounds. Tr. 2227 (#11257).

On September 26, 2008, Wilson was arrested in Atlanta on a state warrant and extradited to Tennessee. *See* Presentence Investigation Report (PSR) ¶ 36. In 2010, while in custody, Wilson wrote a letter to Ricky Williams complaining about the number of Crips in his jail pod. Tr. 465 (#9509). Wilson also asked Williams for financial support and identified his rank as "YOG," or young original gangster. Tr. 466 (#9510).

## III. A jury convicted Wilson of multiple racketeering, murder, and firearm-related offenses.

The government charged Wilson and 32 other Bloods members with various crimes. *See* Second Superseding Indictment, R. 1147 (#3359); PSR ¶¶ 1-2. Most defendants entered guilty pleas, s*ee* PSR, pp. 2-3, but Wilson and co-defendant Rondarius Williamson proceeded to trial.

11

The government presented extensive testimony from Bloods members describing the gang, its rules, and its activities. The witnesses emphasized the expectation that members would "put in work"—namely, fight, shoot, and murder rival gang members. *See* Tr. 200-201 (#9244-9245) (Williams); Tr. 649 (#9686) (Woods); Tr. 882-883 (#9912-9913) (Clark); Tr. 1826 (#10856) (Tate). Several Bloods members also witnessed the Goins and Franklin murders. Jermaine Tate and Joedon Bradley testified that they watched Wilson shoot Goins. Tr. 1848 (#10878); Tr. 2100 (#11130). Ricky Williams and Cedric Woods described Wilson's drive-by shooting of Franklin. Tr. 374-375 (#9418-9419); Tr. 746-747 (#9776-9777).

At the close of the government's case, Wilson filed a motion for judgment of acquittal, asserting, among other claims, that the government presented insufficient proof that Wilson's crimes were committed for the purpose of maintaining or increasing his position within the gang—an essential element of the racketeering-related counts. Tr. 2343 (#11373). The district court denied the motion. Tr. 2359-2364 (#11389-11394).

In the defense case, Wilson called the latent prints examiner who inspected the gun used to murder Michael Goins. She testified that Wilson's fingerprints did not match a fingerprint on the magazine of the gun. Tr. 2380-2383 (#11410-11413). Wilson also called Terrance Davis, who witnessed Alexandra Franklin's

murder from his driveway. Tr. 2392 (#11422). Davis testified that he saw a white SUV (rather than a small four-door car) pull alongside a red car, and watched the SUV's occupants shoot into the red car. Tr. 2395-2397 (#11425-11427). A female victim then "rolled out of the car." Tr. 2398 (#11428). Davis testified that he tried to help the victim, but she was "in shock" and "not coherent." Tr. 2399 (#11429).

After closing arguments, the court submitted the case to the jury, which convicted Wilson of conspiring to participate in racketeering activity and conspiring to use firearms during and in relation to crimes of violence. The jury also convicted Wilson of substantive firearm and racketeering offenses relating to his murders of Goins and Franklin. Tr. 3096-3098 (#12126-12128).

Wilson renewed his motion for judgment of acquittal, again alleging the absence of evidence linking the shootings to a gang-related purpose. *See* Mot. for J. of Acquittal, R. 1570 (#6185). The district court denied the motion: "Viewing the evidence in the light most favorable to the prosecution . . . a rational jury could find that [Wilson] committed the charged acts of violence, in substantial part, to maintain his status in the gang and/or that the acts were an integral aspect of his membership in the gang." Memorandum & Order at 5, R. 1787 (#8364).[5]

---

[5] The district court also denied Wilson's motion for new trial, citing the same reasons. Memorandum & Order at 5-6 (#8364-8365).

13

With respect to Wilson's shooting of Michael Goins, the district court recited testimony that Wilson and other gang members were "chillin in the hood" when Goins arrived, and that the Bloods "'had had words with [Goins]' at a club and were 'beefing' with him." *Id*. at 4 (#8363). In addition, the murder "took place at a Bloods block party, when Goins, a member of a rival gang, drove up." *Id*.

The district court observed that Wilson's second victim—Alexandra Franklin—was the girlfriend of a Crips member. *Id*. The jury heard testimony that the Bloods "thought the Crips had murdered Brandon Mohammed," and that Wilson and others had pledged to "put in some work" on the day of Franklin's murder. *Id*. The district court also noted that other participants in the drive-by shooting—Ricky Williams and Cedric Woods—admitted that they and Wilson were targeting Crips, and that Wilson had encouraged them to shoot Franklin. *Id*. at 4-5 (#8363-8364).

## SUMMARY OF ARGUMENT

On appeal, Wilson contends that the government presented insufficient evidence that he shot his victims for the purpose of maintaining or increasing his position within the Bloods. He urges reversal of his murder-in-aid-of-racketeering convictions. Wilson also presses jury instruction and double jeopardy claims.

14

1. The government's proof amply supported the jury's conclusion that Wilson murdered his victims for the purpose of promoting or maintaining his position within the gang. The jury heard testimony from several Bloods members, all of whom stated that they and their associates regularly "put in work"—fighting, assaulting, and shooting Crips, Gangster Disciples, and other rivals. Indeed, these witnesses reported that the gang expected this brutality, and promotions (or "rank") would be awarded based on each member's violent activities.

Michael Goins and Alexandra Franklin were obvious targets for the Bloods. Goins belonged to a rival gang set, had previously fought the Bloods, and had threatened to "get" Wilson. Franklin dated a Crip member who had threatened to kill the girlfriend of a Bloods member. Under the Bloods' rules, both circumstances would justify retaliation. Thus, by shooting Goins and Franklin, Wilson took the action that was expected of him by reason of his membership.

Other evidence corroborates this conclusion. Several days before the Goins murder, Wilson discussed with a Bloods leader his desire to shoot Goins. Hours before the Franklin murder, Wilson and several other Bloods members agreed to "put in work" and target their Crip rivals. And a letter from a fellow Blood indicates that Wilson was in fact promoted in rank contemporaneous with the Goins shooting. The jury rationally concluded from this evidence that Wilson

murdered Goins and Franklin with the goal of maintaining or advancing his position within the Bloods.

2.   The jury also convicted Wilson of conspiracy to use and carry a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(o).  In its instructions, the district court identified four possible "crimes of violence" that could serve as predicate offenses for this charge.  But the court did not ask jurors to identify which predicate offense they selected, or otherwise instruct them to decide this issue unanimously.  Wilson alleges error in that omission.

Wilson failed to raise this objection below, limiting this Court's review to plain error.  He cannot prevail under that demanding standard because the alleged error was not "plain" and did not affect his substantial rights.  The jury instructions and verdict show that the jury unanimously agreed on the predicate offense— murder in aid of racketeering—for this conspiracy.

3.   The jury further convicted Wilson of conspiracy to participate in racketeering activity, in violation of 18 U.S.C. § 1962(d).  In its instructions, the district court informed the jury that, on this charge, it had to find that Wilson joined the conspiracy and agreed that someone in the conspiracy would commit at least two acts of racketeering (like homicide, drug distribution, and robbery).  Over Wilson's objection, the district court refused to instruct the jury that it needed to agree unanimously on the two predicate acts of racketeering.

16

Wilson alleges error in that decision, but he is wrong. A RICO conspiracy does not require proof of the specific predicate acts supporting the conspiracy. Because the jury did not need to identify any specific predicate act to convict Wilson, Wilson was not entitled to a unanimity instruction on that issue. Furthermore, the alleged error was harmless. The jury separately convicted Wilson of two counts of murder in aid of racketeering. When the jury reached a unanimous verdict on those counts, it necessarily found two predicate acts for purposes of the RICO conspiracy.

4. Finally, Wilson claims that he received multiple punishments for the same act, in violation of the Double Jeopardy Clause. He is correct. The government charged Wilson with two firearm offenses for each murder—using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); and causing the death of his victims through the use of a firearm, in violation of 18 U.S.C. § 924(j). The former is a lesser-included offense of the latter. While the government could charge both offenses, the Double Jeopardy Clause prohibits the imposition of separate punishments.

For these reasons, the Court should remand the case to the district court with instructions to vacate Wilson's sentences on the two § 924(c) offenses (Counts Three and Seven). It should affirm in all other respects.

17

# ARGUMENT

## I.    The government presented sufficient evidence to convict Wilson of murder in aid of a racketeering enterprise (Counts 2 and 6).

The jury convicted Wilson on Counts Two and Six—committing a violent crime in aid of racketeering activity (VICAR).  The VICAR statute makes it a crime to "murder[]" for "the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."  18 U.S.C. § 1959(a).    The term "'enterprise' includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1959(b)(2).  "Racketeering activity" includes "murder" and "dealing in a controlled substance." 18 U.S.C. §§ 1959(b)(1), 1961(1).  Finally, the "purpose" requirement is satisfied if the defendant committed the murder with a "general purpose[] or dominant purpose[]" of maintaining or enhancing his status within the gang, or if the murder was an "integral aspect" of the defendant's gang membership.  *United States v. Banks*, 514 F.3d 959, 969 (9th Cir. 2008) (citations omitted).

All but one of the VICAR elements are undisputed in this appeal.  Wilson does not challenge the jury's finding that he murdered Michael Goins and Alexandra Franklin.  Nor does he contest that his Bloods gang is an "enterprise engaged in racketeering activity."    Instead, Wilson asserts (Br. 19) that the

government's evidence failed to demonstrate that he murdered his victims for the purpose of promoting his position in a racketeering enterprise.

### a.    Standard of Review.

The Court must affirm Wilson's convictions "if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt."  *United States v. Solorio*, 337 F.3d 580, 588 (6th Cir. 2003) (citation omitted).  The Court "neither independently weighs the evidence, nor judges the credibility of witnesses who testified at trial." *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999).  It simply asks whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted).  This standard imposes a "very heavy burden" on defendants who advance sufficiency claims.  *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007) (citation omitted).

Wilson denies that he killed his victims for a gang-related purpose.  Because "direct evidence of . . . intent is hard to come by," "circumstantial evidence alone is sufficient to sustain a conviction" on this type of a mental-state element.  *United States v. Ross*, 502 F.3d 521, 530 (6th Cir. 2007) (citation omitted).

19

### b.    The jury could reasonably conclude that Wilson murdered his victims to promote his position within the Bloods.

The jury heard extensive testimony that the Bloods regularly targeted rival gangs, and that such acts were expected of Bloods members.  Wilson's murders followed that expectation, allowing the jury to conclude that Wilson acted with the requisite intent of maintaining or increasing his position in the gang.

### i.    The Bloods were conditioned to kill rival gang members.

The Bloods organized around a common set of principles, many of which involved acts of violence against the Crips and other rival gangs.  Each of the government's cooperating witnesses discussed this ethos.  The Bloods also recited communal oaths that glorified aggression and vowed revenge for harms to fellow members.  *See* Tr. 225 (#9269) (Blood Oath) ("Creep them niggas and put me to sleep.  I did it for y'all.  Y'all do it [kill] for me."); Tr. 1828 (#10858) (Skyline Prayer) ("Put a crab [Crip] in the dust.").

Promotion within the Bloods' hierarchy required dutiful adherence to these principles.  Members who fought and shot at rival gangs rose in stature.  Tr. 200-201 (#9244-9245).  "[I]t was mandatory . . . That was stuff [a member] had to do in order to gain rank."  Tr. 1826 (#10856) (Tate).  Meetings also reflected the gang's fixation with violence.  Each individual would report his interactions with rivals.  Tr. 1824 (#10854).  Armed with this information, members could avenge a fallen

comrade and "watch [their] back[s]" for acts of retaliation.   Tr. 332 (#9376) (Williams).

Wilson responds (Br. 24) that the government's evidence documenting the Bloods' organization "was general and not tied to a specific time."   Wilson is correct (Br. 25) that some of the testimony related to conversations that occurred "in 2005, before Wilson joined the Bloods," whereas other testimony addressed events "in 2010, long after the Goins murder . . . and the Franklin murder."   But witnesses offered identical descriptions of the gang enterprise at both time points. The jury could reasonably conclude that the same violence-based culture and hierarchy persisted in the intervening years, when Wilson committed the murders. *See Banks*, 514 F.3d at 971-72 (relying on generalized testimony from a detective and a former gang member "about customs within the Rolling 60s and about the gang's expectations of its members").

Wilson further faults (Br. 24) the government for failing to place Wilson at a particular meeting where leaders discussed rules or the "put in work" requirement. This argument is baseless.  The jury could infer that Wilson, a full-fledged Bloods member who ultimately achieved the rank of "young original gangster," harbored this general knowledge about the gang.

In any event, the government's evidence showed that Wilson was aware of the gang's customs.  Wilson contacted Ricky Williams in May 2010 from jail.  In

21

his letter, Wilson expressed hatred towards the Crip inmates ("These Crip niggas ain't about nothing.  They just stick."), celebrated a recent fight with a Crip ("I went so hard on him one day, he shouldn't even have his OG."), and referenced his rank in a plea for money ("Keairus. YOG.").  Tr. 465-466 (#9509-9510).  This letter revealed Wilson's ingrained animus towards rivals, his pride in violence, and his willingness to pull rank to solicit money from the gang's coffers—all features of an active and experienced Bloods member.  After reviewing it, the jury could reasonably infer that Wilson—like any other Blood—understood and embraced the gang's trajectory:  He knew to put in work, battle rivals, and respect rank.

> ii.    *The record supports the jury's conclusion that Wilson shot Goins with the general purpose of promoting his position in the gang (Count 2).*

Michael Goins was an obvious target for the Bloods.  He belonged to a rival group—the Gangster Disciples.  Moreover, Goins had previously fought the Bloods and, on the day of the murder, Goins appeared at a Bloods block party.

Goins was also an obvious target for Wilson.  Goins told people that he planned to "get" Wilson. Tr. 1845 (#10875).  As a Bloods member, Wilson would be expected to respond in kind.  According to gang rules, "[i]f a crab disrespects, handle your business," meaning "assault them or possibly shoot them."  Tr. 221 (#9265) (Williams).  Any other response "would be considered weak."  *Id*.  From the witness testimony on these points, "the jury could properly infer that the

22

defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise"; thus, "the motive requirement is satisfied." *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001) (citation omitted); *accord Banks*, 514 F.3d at 971 (purpose element satisfied by testimony that "if a member failed to [retaliate against a gang rival], he would be considered 'a buster and a punk,'" which "means nobody's gonna respect you."); *United States v. Carson*, 455 F.3d 336, 370 (D.C. Cir. 2006) ("Threatened by a rival gang member, Carson took the action that was expected of him by reason of his membership.") (internal quotation and citation omitted).

In response, Wilson denies any link between his shooting of Goins and a desire to advance the Bloods' enterprise. He states (Br. 27) that "the government presented no proof[] of any gang meeting at which members of the gang discussed killing Michael Goins." But the VICAR statute contains no requirement for group discussion; the government need only show that Wilson murdered Goins with the intent to promote his position with the Bloods. In any event, the government's evidence did show consultation. Several days before the murder, Wilson discussed the matter with Lonnie Newsome—a fellow Blood and original gangster of Tree Top Piru. Tr. 1845 (#10875). Given Newsome's apparent approval of the murder (so long as Wilson did it away from Newsome's car), the jury could conclude that the gang sanctioned Wilson's attack on Goins.

23

Wilson also disputes (Br. 27) any relationship between the murder and his status. But the jury heard numerous witnesses testify that the Bloods awarded rank based on assaults of rival gang members. And more to the point, Wilson received a promotion contemporaneous with Goins's murder. Wilson shot Goins on June 14, 2008. In two letters, dated June 20 and July 11, Cedric Woods wrote to Donald Dowell, complaining that the gang had raised Wilson's rank to "B.G." (baby gangster). Tr. 721, 726 (#9751, 9756). Although Woods did not know why the Bloods had promoted Wilson, the jury could reasonably infer a connection given the brief time between the murder and the promotion.

In sum, Wilson understood that violent acts against rivals enhanced one's status in the Bloods, he had a particular incentive to target Goins, and he received a promotion after the murder. From this, the jury could easily conclude that Wilson murdered Goins to maintain or increase his status with the gang.

> iii.    *The record also supports the jury's conclusion that Wilson shot Franklin with the general purpose of promoting his position in the gang (Count 6).*

Wilson's purpose in murdering Alexandra Franklin was even clearer. Hours before the shooting, Wilson and other Bloods discussed "putting in work" against the Five Deuce Hoover Gangster Crips. The group then drove to their rivals' neighborhood and spotted a target, but retreated when a police car appeared. Undeterred, Wilson and the others traveled to Parkwood—the home of the 98

24

Mafia Main Street Crips—to continue their hunt.  Alexandra Franklin was their choice; her boyfriend, Clarence Shaw, was a Crip who had previously threatened to kill Cedric Woods's girlfriend.

Every step in this sequence evinces a gang-related objective.  Wilson and the others agreed to "put in work" that day and target rival gangs—actions that conformed to the Bloods' general expectation of its members.  The group also executed the plan; they drove to two different neighborhoods and indiscriminately searched for Crips to shoot.  Finally, Wilson and the others selected Franklin for a particular gang-related reason.  Because her boyfriend had previously threatened Woods's girlfriend, retaliation against Franklin was an appropriate response.  *See United States v. Farmer*, 583 F.3d 131, 142 (2d Cir. 2009) ("[T]he government introduced substantial evidence that the Bloods deemed an attack against one Blood to be an attack against all, and that Bloods could rise within the gang by defending their peers and committing acts of violence against rival gangs."); *Banks*, 514 F.3d at 971 (purpose element satisfied where gang "expected affronts to gang members to be met with a violent response.").  On this record, the jury could reasonably discount Wilson's claim (Br. 5) that "the motivation for the murder[] was personal."[6]

---

[6]    Wilson states (Br. 23) that his purpose in murdering his victims "must be integral, more than merely incidental" to his gang membership.  Wilson then quotes portions of a Ninth Circuit decision discussing appropriate jury instructions

Wilson again denies any gang connection in this murder. He observes (Br. 27) that the group abandoned the original plan to attack the Five Deuce Hoover Gangster Crips. But their revised plan—to target a 98 Mafia Main Street Crips member—promoted the same gang-related purpose. Wilson also states (Br. 27) that Franklin did not belong to the Crips. Yet when the group spotted Franklin, "Wilson . . . identified her as Killa Pooh's [Shaw's] girlfriend." Tr. 369 (#9413) (Williams). Regardless of Franklin's actual status, Wilson affiliated her with the Crips and branded her an enemy. That action revealed Wilson's gang-based motive.

Finally, Wilson characterizes (Br. 27) his shooting of Franklin as "a spontaneous act," unrelated to the Bloods. The record supports the contrary inference. When two members of the group—Ricky Williams and Cedric Woods—hesitated to shoot Franklin, Wilson goaded them into action, reminding them that her Crip-member boyfriend had previously threatened to kill Woods's girlfriend. Tr. 370 (#9414), Tr. 736 (#9766). This fact is critical. "[O]nce [Wilson] had enlisted the aid of his fellow enterprise members in his behalf, he acted not only for himself but as a member of the enterprise in furthering its

---

for VICAR counts. Br. 23 (citing *Banks*, 514 F.3d at 968-69). But Wilson fails to discuss the next portion of the decision, which "unequivocally" rejected the defendant's sufficiency claim on VICAR's purpose requirement. *See Banks*, 514 F.3d at 970-72. The Ninth Circuit's sufficiency analysis in *Banks* mirrors the government's sufficiency discussion here.

policies of retaliatory violence against any who sufficiently antagonized any of its members, and in order to maintain his position in it." *United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996); *accord Banks*, 514 F.3d at 972 (observing that "Banks . . . had enlisted his 'little homies' in the gang to beat up and shoot at [the victim] on his behalf, implying that what motivated Banks to repeatedly attack [the victim] could have been—or had become—more than merely a personal vendetta"). The government's evidence was therefore sufficient.[7]

## II. The district court did not commit plain error when instructing the jury on the elements of conspiracy to use and carry firearms during and in relation to crimes of violence (Count 27).

In Count 27, the grand jury charged Wilson and others with one count of conspiring to use and carry a firearm during and in relation to crimes of violence, in violation of 18 U.S.C. § 924(o). At the close of trial, the district court instructed the jury that, to convict Wilson or co-defendant Williamson of this conspiracy, it had to find three essential elements beyond a reasonable doubt:

- [T]he defendant knowingly and voluntarily joined a conspiracy in which he agreed to use or carry firearms;

- [T]he defendant used or carried such firearms during and in relation to the commission of crimes of violence;

---

[7]    The government agrees with Wilson (Br. 27-28) that the VICAR convictions served as predicate offenses for other counts of conviction: Counts Three and Four were predicated on Count Two; Counts Seven and Eight were predicated on Count Six; and Count 27 was predicated on either Count Two or Count Six. Thus, if the Court were to vacate either Count Two or Count Six on sufficiency grounds, it should also vacate any associated counts.

27

- [T]he crimes of violence are ones for which the defendant may be prosecuted in a court of the United States.

Tr. 3026 (#12056). The court identified four "crimes of violence" that could serve as predicate offenses for the charge: robbery, murder in aid of racketeering, assault with a dangerous weapon in aid of racketeering, and carjacking. *Id*.

During deliberations, the jury asked whether the alleged conspiracy "ha[d] to include all acts of violence." Tr. 3084 (#12114). Wilson responded that the jury should have "to find more than one crime of violence to find this conspiracy" because "the government charged this in the conjunctive," referencing multiple "crimes of violence" in Count 27. Tr. 3084-3085 (#12114-12115). The district court disagreed: "The government can charge the conjunctive, and both do not have to be found." *Id*.; *accord United States v. Stone*, 954 F.2d 1187, 1192 (6th Cir. 1992) (citing the "well-established rule . . . that an indictment may charge several acts in the conjunctive yet support a conviction of only one of the acts charged"). The court thus informed the jury that it only had to "find one or more acts of violence" to convict on Count 27. Tr. 3095 (#12125).

In this discussion, the district court realized that it had "misworded" another part of the instruction. Tr. 3093 (#12123). The court had directed the jury to determine only whether "the defendant used or carried such firearms during and in relation to the commission of crimes of violence." Tr. 3026 (#12056). Yet

28

because Count 27 was "a conspiracy charge," the court observed, "the defendants don't have to have used or carried firearms, it's the defendants *or their co-conspirators*." Tr. 3093 (#12123) (emphasis added). The court further noted that the defendants themselves did not have to commit the crime of violence; "again, it's the defendants *or their co-conspirators*." *Id*. (emphasis added). With deliberations underway, however, the district court refused to correct the error.

The jury convicted Wilson on Count 27. On appeal, Wilson complains (Br. 30) that the district court should have informed the jury that "it had to unanimously decide on which crimes of violence were committed" in the conspiracy.

### a.    Standard of Review.

Wilson forfeited his claim of instructional error. He objected to the district court's supplemental instruction, in response to a jury note, that jurors need only find "one or more" predicate crimes of violence to convict on Count 27. But Wilson did not object to any other portion of the district court's instructions, nor did he seek a separate instruction directing the jury to agree unanimously on which crime of violence was associated with the § 924(o) conspiracy.

Because Wilson failed to object to the jury instructions or request a specific unanimity instruction, the Court reviews his claim for plain error. *See United States v. DeJohn,* 368 F.3d 533, 540 (6th Cir. 2004). To obtain relief, Wilson must

29

show that (1) there was an error (2) that was plain, (3) that affected a substantial right, and (4) seriously affected the fairness, integrity, or public reputation of the judicial proceedings.  *See United States v. Martin,* 520 F.3d 656, 658 (6th Cir. 2008).  "In the context of challenges to jury instructions, plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely to produce a grave miscarriage of justice."  *United States v. Morrison*, 594 F.3d 543, 546 (6th Cir. 2010) (citation omitted).

### b.    The alleged error was not plain.

Wilson characterizes (Br. 30) the predicate offense requirement as an essential element of a § 924(o) offense, requiring unanimous jury fact-finding. *Cf. Richardson v. United States*, 526 U.S. 813, 817 (1999) ("[A] jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element.").  Because the district court did not specifically instruct the jury to address this issue unanimously, Wilson fears (Br. 31) that the jury could have "avoid[ed] discussing the specific details of each alleged underlying crime of violence" and "disagree[d] . . . about what [he] did or did not do," yet still have convicted him of the conspiracy.

Wilson cites no authority, and the government is aware of none, where a court has decided the question whether unanimity is required for § 924(o)'s predicate-act requirement.  Rather, Wilson lists (Br. 30-31) several other statutes,

30

some that require unanimity on predicate-act requirements and others that do not. Wilson's struggle to analogize § 924(o) to the former group shows that any error here could not have been "obvious or clear" under the second prong of plain-error review. *United States v. Woodruff*, 726 F.3d 845, 848 (6th Cir. 2013).

      **c.**    **The alleged error was necessarily harmless**.

Even assuming that the district court should have instructed on the need for jury unanimity as to the predicate offense, the error was harmless and thus could not have affected Wilson's substantial rights for plain-error purposes. *See Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000) (applying harmless-error review to district court's failure to issue unanimity instruction). The jury instructions and verdict dispel any suggestion of juror disagreement on which offense served as the predicate "crime of violence" for Wilson's § 924(o) conviction.

First, the jury could not convict Wilson on the basis of co-conspirator liability. The district court (erroneously) instructed the jury that, to convict on the § 924(o) count, it had to find that Wilson had *himself* used or carried firearms during and in relation to a crime of violence.

In addition, the district court identified only four "crimes of violence" for the jury to consider: robbery, murder in aid of racketeering, assault with a dangerous weapon in aid of racketeering, and carjacking. Wilson was not personally charged

with robbery or carjacking.  As the jury did not receive an instruction on co-conspirator liability, the jury's verdict did not rely on those offenses.

Finally, the jury acquitted Wilson of assault with a dangerous weapon in aid of racketeering (Count Five).  This charge therefore did not serve as a predicate offense for Wilson's § 924(o) conviction.

Only one charge remains on the district court's list—murder in aid of racketeering.  Because the jury unanimously convicted Wilson of that offense in Counts Two and Six, it is easy to see that the jury also selected murder in aid of racketeering as the predicate "crime of violence" for Wilson's § 924(o) conviction.  No disagreement occurred on this issue.

It is also "clear beyond a reasonable doubt that a rational jury would have found [Wilson] guilty absent the error."  *Neder v. United States*, 527 U.S. 1, 18 (1999).  Wilson does not challenge the jury's determination on § 924(o)'s first element—that he voluntarily joined a conspiracy in which he agreed to use or carry firearms.  The evidence is also overwhelming that Wilson himself used firearms in relation to two crimes of violence—his murders of Michael Goins and Alexandra Franklin in aid of the Bloods' racketeering enterprise.  Multiple witnesses testified that Wilson shot these victims and that Wilson had planned the killings with other gang members in the conspiracy (Lonnie Newsome for the Goins murder; Ricky Williams and Cedric Woods for the Franklin murder).

Because the jury unanimously convicted Wilson of two violent gun crimes in other counts, and because those predicate offenses necessarily fell within the scope of Count 27's firearm conspiracy, any instructional error did not prejudice Wilson's substantial rights or undermine the integrity of the trial.

## III. The district court did not err when instructing the jury on the elements of conspiracy to participate in racketeering activity (Count 1).

The RICO statute makes it a crime "to conspire" to commit a substantive RICO offense.   18 U.S.C. § 1962(d).   A substantive RICO offense involves participation in "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997) (citing 18 U.S.C. § 1962(c)).  The RICO statute defines a "pattern of racketeering activity" to require "at least two acts of racketeering activity," 18 U.S.C. § 1961(5), including murder, drug trafficking, and robbery, *see* 18 U.S.C. § 1961(1)(A).   The government's theory in this case was that Wilson and others conspired to promote the Bloods gang through a pattern of racketeering activity, including multiple acts of murder, drug trafficking, robbery, and extortion.   *See* Second Superseding Indictment, R. 1147 (#3364-3365).

The district court instructed the jury that, to convict Wilson of RICO conspiracy, it had to find three essential elements beyond a reasonable doubt:

- A conspiracy or agreement as detailed in the indictment existed between two or more persons to conduct or participate directly or indirectly in the affairs of an enterprise that affected interstate commerce through a pattern of racketeering activity;

- Defendant[] Wilson . . . knowingly and willfully joined or became [a] member[] of the conspiracy or agreement with knowledge of its purpose;

- Defendant[] Wilson . . . agreed that someone, not necessarily [himself], would commit at least two of the following racketeering acts.

Tr. 2983-2984 (#12013-12014).  The district court then listed 19 possible predicate racketeering acts involving homicide, drug distribution, and robbery.  Tr. 2984-2985 (#12014-12015).  The court also defined each type of offense for the jury.  *See* Tr. 2988-3012 (#12018-12042).

Wilson objected to the district court's articulation of the third element of the RICO conspiracy charge.  He urged the court to "indicate . . . that [jurors] have to agree on which two racketeering acts constitute the offense."  Tr. 2743 (#11773).  Wilson also wanted the jury to "designate those two acts on the verdict form."  *Id.*  The district court overruled the objection.  *Id.*

### a.    Standard of Review.

The Court reviews a district's court denial of a requested jury instruction for abuse of discretion.  *United States v. Anderson*, 605 F.3d 404, 411 (6th Cir. 2010).  "An abuse of discretion will not be found if the jury instructions as a whole adequately informed the jury of the relevant considerations and provided a basis in

law for aiding the jury in reaching its decision." *Id*. (alteration, quotation marks, and citation omitted).

> **b.   The court correctly refused the proposed instruction because a RICO conspiracy charge does not require juror unanimity as to the underlying predicate acts**.

Wilson renews (Br. 33-35) his attack on the district court's instruction for the third element of the RICO conspiracy charge. He argues that the court should have further directed the jury to identify unanimously the predicate racketeering acts undergirding the RICO conspiracy. Wilson's argument lacks merit.

In *Salinas*, the Supreme Court interpreted 18 U.S.C. § 1962(d) to cover "an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." 522 U.S. at 65. The relevant question is whether the defendant "agreed that *someone* would commit two predicate acts." *United States v. Driver*, 535 F.3d 424, 432 (6th Cir. 2008).

For that reason, "a RICO conspiracy charge does not . . . require that the defendant 'agreed to commit two predicate acts himself, or . . . that any overt acts have been committed'" by his associates. *United States v. Fowler,* 535 F.3d 408, 421 (6th Cir. 2008) (citing *Salinas*, 522 U.S. at 63); *accord United States v. Randall*, 661 F.3d 1291, 1297 (10th Cir. 2011) ("[I]t is not necessary to prove the specific predicate acts that supported a RICO conspiracy charge in order to prove a defendant's participation in a RICO conspiracy."); *United States v. Applins*, 637

F.2d 59, 81 (2d Cir. 2011); *United States v. Hein*, 395 Fed. Appx. 652, 656 (11th Cir. 2010); *United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991).

Because RICO does not require proof of the specific predicate acts supporting the conspiracy, Wilson was not entitled to an instruction on that issue. The courts of appeals to have considered the question have so held.  *See Randall*, 661 F.3d at 1299 (holding that district court was not required to give a unanimity instruction on predicate acts because there is no requirement that the jury "be unanimous as . . . to the specific predicate acts themselves"); *Applins*, 637 F.3d at 82 (approving RICO conspiracy instruction that did not "requir[e] a finding of specific predicate acts"); *Hein*, 395 Fed. Appx. at 656 ("[Defendants'] argument that the jury had to unanimously agree on particular and individual acts and not just the general types of predicate offenses is not supported by the law and thus was not required in a jury instruction.").

Wilson responds (Br. 33) that he was "entitled to have the jury unanimously determine the existence of each factual element" of the RICO conspiracy offense. As discussed above, however, the courts have uniformly rejected arguments that specific predicate acts constitute an essential element of a RICO conspiracy charge.[8]   Wilson also complains (Br. 35) that the absence of a unanimity

---

[8]     Wilson's discussion (Br. 33-34) of *United States v. Flynn*, 87 F.3d 996, 999-1000 (8th Cir. 1996), is inapposite.  *Flynn* addressed jury instructions detailing the elements of a substantive RICO charge, not a RICO conspiracy charge.

instruction for predicate acts allowed the jury to "return[] a verdict finding [him] guilty without really deciding what he did." Br. 41.  But as noted above, the RICO conspiracy statute focuses "on the act of *agreement*," not "the identification . . . of specific predicate acts." *Glecier*, 923 F.3d at 501.  The statute does not require that the defendant commit any predicate acts, or even that he agree to the commission of specific predicate acts by others in the conspiracy.

At bottom, the government need only demonstrate that the defendant entered the conspiracy and agreed that someone in the enterprise would commit "*the types of predicate racketeering acts*" listed in the statute.  *Randall*, 661 F.3d at 1299 (emphasis added).  Because it was not necessary for the government to identify any specific predicate act to secure Wilson's conviction on the RICO conspiracy charge, the district court properly refused Wilson's request for a unanimity instruction.

c.    **Any instructional error was harmless**.

Even assuming the district court erred in refusing Wilson's request for a unanimity instruction, the error was harmless.  *See United States v. Kelsor*, 665 F.3d 684, 695 (6th Cir. 2011) ("Reversal is not required if the defendant suffers no actual prejudice" from the district court's refusal to deliver a requested instruction.).

37

Wilson does not challenge the district court's instructions on the first two elements of the RICO conspiracy charge. He argues only that, under the third element, the jury was required to determine unanimously the existence of at least two predicate acts.

The record demonstrates that the jury completed the task. The district court identified 19 possible racketeering acts to support a RICO conspiracy charge, including Wilson's shooting and killing of Michael Goins on June 14, 2008; and his shooting and killing of Alexandra Franklin on July 19, 2008. Tr. 2984 (#12014). The government also charged those predicate acts as standalone offenses in Counts Two and Six (alleging that Wilson murdered Goins and Franklin in aid of racketeering). When the jury rendered unanimous guilty verdicts on Counts Two and Six, it necessarily found that Wilson committed two predicate racketeering acts for purposes of the RICO conspiracy in Count One. As a result, Wilson suffered no prejudice from the district court's refusal to give his proposed instruction. Wilson's conspiracy conviction should stand.

## IV. The Court should vacate Wilson's § 924(c) sentences to cure the double jeopardy violation (Counts 3 and 7).

The jury found Wilson guilty under 18 U.S.C. § 924 of four substantive offenses:

- Count Three: Using and carrying a firearm during and in relation to a crime of violence—the murder of Michael Goins in aid of racketeering;

38

- Count Four:  Causing the death of Goins through the use of a firearm in the course of committing the violation set forth in Count Three;

- Count Seven: Using and carrying a firearm during and in relation to a crime of violence—the murder of Alexandra Franklin in aid of racketeering;

- Count Eight:  Causing the death of Franklin through the use of a firearm in the course of committing the violation set forth in Count Seven.

The district court imposed concurrent terms of life imprisonment on Counts Four and Eight, and consecutive sentences of 10 years on Count Three and 25 years on Count Seven.  Wilson now alleges that the district court's decision to impose punishments on all four counts violated the Double Jeopardy Clause.[9]  He argues (Br. 37) that Counts Three and Seven (the "use" counts) are lesser-included offenses of Counts Four and Eight (the "murder" counts).  The government agrees.

The Double Jeopardy Clause protects individuals from receiving multiple punishments for the same offense.  *See United States v. DeCarlo*, 434 F.3d 447, 454 (6th Cir. 2006).  The "use" counts under § 924(c) and the "murder" counts under § 924(j) flow from the same transactions—Wilson's shootings of Goins and Franklin.  There is no evidence that Congress intended multiple punishments in this circumstance.  The "use" counts are lesser-included offenses of the "murder" counts, which carry an additional element that the defendant caused the death of an

---

[9]    Because Wilson did not raise his double jeopardy claim before the district court, this Court would conduct plain-error review.  The government believes Wilson is entitled to relief under that standard.

individual while using the firearm. *See United States v. Catalan-Roman*, 585 F.3d 453, 472 (1st Cir. 2009) (carrying a firearm in furtherance of a robbery under 18 U.S.C. § 924(c)(1)(A)(iii) is a lesser-included offense of using a firearm during robbery that resulted in victim's death under 18 U.S.C. § 924(j)). While the government could charge the counts, Wilson could not be sentenced on both. *See Ball v. United States*, 470 U.S. 856, 860-861 (1985).

Upon affirming Wilson's convictions and sentences under § 924(j), the Court should remand the case to the district court with instructions to vacate Wilson's sentences on the lesser-included § 924(c) convictions—Counts Three and Seven. *See, e.g.*, *DeCarlo*, 434 F.3d at 457 (vacating lesser-included counts).[10]

---

[10]    In a final section, Wilson discusses the appropriate remedy should the Court affirm his conviction on Count One (conspiracy to participate in racketeering activity), but vacate his convictions on all other counts. Wilson states (Br. 38-39) that he would be entitled to a new sentencing hearing. For reasons already discussed, Wilson's sentences on Counts Three and Seven are infirm and should be vacated. The jury's verdict on the remaining counts is sound. But assuming this Court vacated all of Wilson's convictions except Count One, the government agrees that Wilson would be entitled to resentencing.

## CONCLUSION

The Court should remand this matter to the district court with instructions to vacate Wilson's sentences on Counts Three and Seven. The Court should affirm the district court's judgment in all other respects.

Respectfully submitted,

DAVID RIVERA
Acting United States Attorney

MYTHILI RAMAN
Acting Assistant Attorney General

SCARLETT M. SINGLETON
Assistant United States Attorney
Middle District of Tennessee

DENIS J. MCINERNEY
Acting Deputy Assistant Attorney General

/s/David M. Lieberman
DAVID M. LIEBERMAN
Attorney
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 305-4620
david.lieberman@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,354 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared on a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

/s/David M. Lieberman

# DESIGNATION OF DISTRICT COURT RECORD

The government designates the following documents from the district court's record:

| Docket No. | Document | Page ID # |
|---|---|---|
| R. 1147 | Second Superseding Indictment | 3359-3421 |
| R. 1570 | Motion of Judgment of Acquittal | 6185-6207 |
| R. 1787 | Memorandum and Order | 8360-8949 |
| R. 1880 | Judgment | 8943-8949 |
| R. 1888 | Notice of Appeal | 8990 |
| R. 1898 | Trial Transcript Volume 2 | 9066-9322 |
| R. 1899 | Trial Transcript Volume 3 | 9323-9596 |
| R. 1900 | Trial Transcript Volume 5 | 9597-9702 |
| R. 1901 | Trial Transcript Volume 7 | 9703-9884 |
| R. 1902 | Trial Transcript Volume 8 | 9885-10136 |
| R. 1903 | Trial Transcript Volume 9 | 10137-10414 |
| R. 1904 | Trial Transcript Volume 10 | 10415-10715 |
| R. 1905 | Trial Transcript Volume 11 | 10716-11017 |
| R. 1906 | Trial Transcript Volume 12 | 11018-11275 |
| R. 1907 | Trial Transcript Volume 13 | 11276-11560 |

| R. 1908 | Trial Transcript Volume 14 | 11561-11777 |
|---------|---------------------------|-------------|
| R. 1909 | Trial Transcript Volume 15 | 11778-12072 |
| R. 1910 | Trial Transcript Volume 16 | 12073-12110 |
| R. 1911 | Trial Transcript Volume 17 | 12111-12132 |
| R. ____ | Presentence Investigation Report | |

# CERTIFICATE OF SERVICE

I certify that, on October 11, 2013, I served an electronic copy of the Brief

for the United States on counsel for appellant via the Court's ECF system:

Kenneth P. Tableman
161 Ottawa Ave., N.W., Suite 404
Grand Rapids, Michigan  49503-2701


/s/David M. Lieberman

45